UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RONALD R. MYERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 08 C 6243 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | Judge Nan R. Nolan |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Ronald R. Myers claims that he is disabled due to bilateral vocal cord paralysis; permanent tracheostomy; schizoaffective disorder; and depression. He filed this action seeking review of the final decision of the Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. 42 U.S.C. § 1381a. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and have now filed cross-motions for summary judgment. For the reasons set forth here, Plaintiff's motion is granted in part and denied in part, and the Commissioner's motion is denied.

## PROCEDURAL HISTORY

Plaintiff applied for SSI on November 10, 2005, alleging that he became disabled on September 1, 1998 due to breathing problems, speech problems and a trachea in his throat. (R. 159.) The application was denied initially on February 8, 2006, and again on reconsideration on March 10, 2006. (R. 78, 85-88, 90-93.) Plaintiff appealed the decision and requested an administrative hearing, which was held on September 19, 2006. Less than a week later, on September 25, 2006, Administrative Law Judge Michael R. McGuire (the "ALJ") denied Plaintiff's claim for benefits, finding that he was capable of performing light, unskilled work. (R. 78-84.)

Plaintiff appealed the decision, and on February 16, 2007, the Appeals Council remanded the case to the ALJ for further consideration. (R. 22-24, 127-28.) The ALJ held a new hearing on November 13, 2007, at which time Plaintiff's counsel amended his disability onset date to November 10, 2005. (R. 48.) On June 10, 2008, the ALJ again denied Plaintiff's claim for benefits. (R. 12-20.) The ALJ found that Plaintiff's paralyzed vocal cords and permanent tracheostomy are severe impairments, but that he retains the residual functional capacity ("RFC") to work as a file clerk or general office clerk. (R. 15, 19.) This time, the Appeals Council denied Plaintiff's request for review, and he filed a timely complaint with the district court. (R. 1-3.) Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner.

## **FACTUAL BACKGROUND**

Plaintiff was born on February 15, 1964 and was 44 years old at the time of the ALJ's June 10, 2008 decision. (R. 140.) Beginning in grade school, he was placed in special education classes, and he dropped out of school in the 10th grade. (R. 29, 62, 336-37.) Plaintiff worked as a paper cutter/printer in 1989 and 1992; as a tank cleaner for a chemical company from 1997-1998; and as a forklift operator in 1997 and from 2000-2001. (R. 160.) From June 21, 2001 to December 2005, Plaintiff was incarcerated at the Logan Correctional Center on charges of residential burglary. (R. 31, 67, 70, 204, 336-37.)

### A. Medical History

In 1989, Plaintiff was hit in the head with a baseball bat, which left him in a coma for six months. (R. 291.) Upon recovering from the coma, Plaintiff lost control of his vocal cords, presumably as a result of a neurological injury. (R. 252.) In 1999, he was diagnosed with "[b]ilateral vocal cord paralysis secondary to old trauma, prolonged intubation." (R. 299.) He had a permanent tracheostomy at that time due to difficulty breathing and swallowing, as well as increasing hoarseness. (R. 291-300.) By December 23, 1999, Plaintiff had made "remarkable

2

changes" and was "totally able to take care of his permanent trach tube." (R. 296.) He could speak without putting his finger up and was "virtually back to normal." (*Id.*)

The next medical records date from the time of Plaintiff's incarceration. Between July 2001 and May 2002, Plaintiff received treatment from the Cermak Health Center because of shortness of breath, difficulty swallowing and neck pain related to the tracheostomy. (R. 303, 305, 306, 310, 312-14.) By May 8, 2002, however, progress notes reported that Plaintiff was "doing well" and "stable," and "not having problems [with his] tracheostomy tube." (R. 325.) The notes further indicated that Plaintiff had been working for approximately four months in the "RU Medical area in the clothing department." (*Id.*) Records from the Logan Correctional Center reflect that Plaintiff needed and received regular care for the cleaning of his tracheostomy tube. (R. 227-51.)

Also during his incarceration, on November 5, 2004, Plaintiff underwent a mental health evaluation with Richard Ibe, Ph.D. Plaintiff told Dr. Ibe that he had received prior treatment for mental health or emotional issues from the age of 18 to 25, and that he had been prescribed Mellaril, an antipsychotic drug used to combat schizophrenia. (http://drugs.com/pdr/mellaril.html.) He made no complaints of depression, anxiety or recent thoughts of harming himself or others, and he denied trying to harm himself in the past. (R. 230.) Dr. Ibe found Plaintiff to have a normal mood and affect, and "a clear and stable mental status." Dr. Ibe concluded that Plaintiff did not need any mental health services at that time. (*Id.*)

On January 13, 2006, Scott A. Kale, M.D., J.D., M.S., performed an internal medicine consultative examination of Plaintiff for the Bureau of Disability Determination Services. (R. 252-55.) Dr. Kale observed that Plaintiff's tracheostomy was "[w]ell healed," "in place," "clean" and "not leaking air." (R. 253.) Plaintiff's lungs were clear at that time, "without rales, rhonchi or wheezes." (*Id.*) Dr. Kale reported that Plaintiff's speech was "somewhat whispering, but nevertheless, clearly understood across the distance of 15 feet." A mental status examination revealed that Plaintiff was well-dressed, alert, appropriate, polite and cooperative, with normal memory and ability to relate.

(R. 254.) Dr. Kale's clinical impression was "[s]tatus post tracheostomy placement secondary to trauma and resulting vocal chord paralysis with complaints of shortness of breath on exertion, not apparent on this exam." (R. 255.)

Shortly thereafter on February 2, 2006, Plaintiff went to the emergency room at John H. Stroger, Jr. Hospital ("Stroger Hospital") complaining of itching and dryness inside his tracheostomy tube. (R. 280.) The ER physician diagnosed him with, and treated him for cellulitis, a skin infection caused by bacteria. (http://www.webmed.com/a-to-z-guides/cellulitis-topic-overview.) The doctor referred Plaintiff to the Fantus Health Clinic, where he received further treatment on February 7, 2006. (R. 277, 279.)

Also on February 7, 2006, Plaintiff underwent a physical RFC assessment with Vidya Madala, M.D. (R. 256-63.) Dr. Madala found that Plaintiff can occasionally lift 20 pounds; frequently lift 10 pounds; stand and/or walk for six hours in an eight-hour workday; and push and pull without limitation. (R. 257.) He has no postural, manipulative or visual limitations, but his speech is "somewhat whispering" and he is "unable to perform work-related activities which require a normal or loud speaking volume." (R. 258-60.)

Plaintiff had CT scans of his chest and neck on April 4, 2006. (R. 273-76.) The tests showed that his endotracheal and tracheostomy tubes were both in place and he had no pleural effusions or metastatic disease to the heart. (R. 273.) There was some "[t]hickening of the right [vocal] cord" but no evidence of mass or lymphadenopathy. (R. 275.) The following month, on May 16, 2006, Plaintiff returned to the Stroger Hospital ER complaining of depression. He was neither suicidal nor homicidal at that time, and the doctor scheduled him for an appointment with a psychiatrist on August 11, 2006. (R. 271-72, 361.) According to Plaintiff, it was around that time, in June 2006, that a physician at Stroger Hospital prescribed him Trazodone, and another unknown doctor prescribed him Prozac. (R. 213.) It is not clear whether Plaintiff kept the August 2006 psychiatric appointment.

4

Approximately ten months later, on April 24, 2007, Plaintiff underwent a psychological evaluation at the request of his attorney. (R. 336-40.) Mary K. Gardner, Psy.D, administered an IQ test and found that Plaintiff has a Verbal IQ score of 68; a Performance IQ score of 72; and a Full-Scale IQ score of 67, placing him "below 99 percent of same-aged peers." (R. 338.) Plaintiff did "very poorly" on the academic tests, scoring at the third grade level on reading (3.2) and the second grade level on math (2.7). (R. 339.) According to Dr. Gardner, Plaintiff could not correctly calculate simple two-digit subtraction problems. (*Id.*)

During the examination, Plaintiff reported feeling "paranoid" when around groups of people, stating generally that he becomes very nervous and fearful of them. He also reported that as a child, he was prescribed Mellaril and Thorazine, which are strong antipsychotic drugs. (R. 337, 339.) With respect to the June 2006 prescriptions for Trazodone and Prozac, Plaintiff stated that after he ran out of the medications, he was unable to afford them. (R. 337.) Plaintiff told Dr. Gardner that he suffers from insomnia, sleeping only one or two hours per night, and he complained of "bad headaches." (R. 339.)

Dr. Gardner opined that Plaintiff was "certainly depressed at the current time." (*Id.*) His raw score on the Beck Depression Inventory was 25, and he reported feeling sad, guilty, and lacking in energy. Plaintiff stated that he tried to commit suicide on two occasions while incarcerated, and he described feelings of extreme inner restlessness, nervousness, worry and irritability. (*Id.*) Based on her evaluation, Dr. Gardner opined that it is "unlikely" that Plaintiff "would be able to sustain meaningful employment given the nature of his medical and psychological problems." (R. 340.)

In her mental RFC assessment of Plaintiff, Dr. Gardner found that he is markedly limited in most areas, including remembering locations and work-like procedures; understanding, remembering and carrying out detailed instructions; maintaining attention and concentration; sustaining an ordinary routine without special supervision; working in coordination with or proximity

5

to others; accepting instructions and responding appropriately to criticism; and maintaining socially appropriate behavior. (R. 341-42.) Dr. Gardner concluded that Plaintiff meets Listing 12.03 of the Social Security Regulations for Schizophrenic, Paranoid and Other Psychotic Disorders. She based this finding on Plaintiff's medically determinable paranoia combined with marked limitations in maintaining social functioning, concentration, persistence or pace, as well as three episodes of decompensation of extended duration. (R. 345, 347, 355.)

**B.    Plaintiff's Testimony**

Plaintiff testified at both of the hearings before ALJ McGuire. (R. 29-36, 50-52, 61-72.) At the first hearing in September 2006, he stated that prior to his incarceration, he worked as a tank cleaner, paper cutter/printer and forklift operator. (R. 29-30.) In prison, he was assigned to "push[] a broom," but he would become very tired. He also experienced coughing and burning in his lungs due to the dust in the air, which resulted in panic attacks. (R. 31.) Plaintiff testified that his lungs hurt when he walks and he does not do much during the day. He tries to read but loses interest after a couple of pages and mostly watches television. Plaintiff said that he barely sleeps sometimes and often wakes up due to breathing difficulties and coughing. (R. 32-36.) During the day, he sometimes dozes off "when I'm reading." (R. 36.)

At the second hearing in November 2007, Plaintiff testified that he was fired from the forklift operator job because he hit a trailer and was told he did not have the necessary skills. (R. 61.) He claimed to have difficulty reading newspapers and stated that he needed other people to fill out job applications for him. (R. 62.) Plaintiff testified that he has to stop and catch his breath after walking one block; his lungs are "constantly full of liquids"; and he is "always coughing up black stuff." (R. 63.) His depression makes him wonder "why am I really here?" and he is paranoid of being around people, but he has not had thoughts of suicide since his incarceration. According to Plaintiff, the Trazodone and Prozac helped these symptoms, but he cannot afford the medications without insurance. (R. 63-65.)

6

Plaintiff claimed that he often has trouble focusing and remembering things, and that he becomes angry, frustrated and loud when someone criticizes him. (R. 64-65.) He was not, however, receiving any psychiatric treatment at that time, again because of a lack of insurance. (R. 66-67.) In response to a question from the ALJ, Plaintiff stated that he had been paranoid for 20 years and that he had not really "earned" his paychecks while working. (R. 67-68.) Plaintiff was living with a friend of his sister's, and he reported sleeping more often (9:00 p.m. to 10:00 a.m.) and trying to help around the house with chores. (R. 69-71.)

**C.    Vocational Expert Testimony**

Edward Pagella testified as a vocational expert at Plaintiff's first hearing. The ALJ described a hypothetical person of Plaintiff's age, education and vocational background, who could occasionally lift and carry 20 pounds; frequently lift and carry 10 pounds; sit, stand and walk for six hours in an eight-hour workday; push or pull 20 pounds; but never be exposed to dust or unventilated spaces. Mr. Pagella testified that such an individual could not perform Plaintiff's prior work as a tank cleaner, paper cutter/printer or forklift driver due to the dust and unventilated fumes. (R. 37.) If the same individual was unable to perform work requiring a normal or loud voice, then he could not engage in any jobs within the service industry. (R. 38.) He could, however, work as a file clerk (6,200 jobs) or a general office clerk (4,600 jobs), which are light jobs not requiring effective communication with the public. (R. 38-39.) Mr. Pagella testified that if the same individual was limited to sedentary work due to difficulties breathing upon standing or walking, then he could still work as a general file clerk (3,800 jobs) or mail sorter. (R. 39-41.) Mr. Pagella further stated, however, that an individual who would be off task for more than 20 percent of the workday could not engage in any substantial gainful activity ("SGA"). (R. 42.)

Michelle Peters testified as a vocational expert at Plaintiff's second hearing. The ALJ described a hypothetical person of Plaintiff's age, education and vocational background, who could occasionally lift and carry 20 pounds; frequently lift and carry 10 pounds; sit, stand and walk for six

hours in an eight-hour workday; push or pull 20 pounds; never be exposed to dust or unventilated spaces; and never speak in a normal or loud voice. Ms. Peters testified that such an individual could not perform Plaintiff's past relevant work but could work as a mail room clerk (1,000 jobs), a sorter (750 jobs), or an office helper. (R. 52-53.) Ms. Peters confirmed that these jobs are consistent with the Dictionary of Occupational Titles ("DOT"). (R. 53.) The ALJ next asked Ms. Peters whether an individual with a Full-Scale IQ of 67 could work as a forklift driver. Ms. Peters indicated that "[t]ypically an individual with that type of IQ would be [relegated] to more of a simple, repetitive type of job." (R. 55.)

Plaintiff's attorney asked Ms. Peters about jobs available to someone who could only work with other people for two-thirds of the day. Ms. Peters testified that none of the jobs she identified would be available to such an individual. (R. 56-38.) If a person was unable to read a newspaper, then there would be a 50% reduction in the number of sorter jobs available, and a 75% reduction in the number of mail room positions available. (R. 59-60.) Ms. Peters finally opined that angry outbursts from an employee who was unhappy about criticism would not be tolerated in any competitive employment. (R. 66.)

**D.    The ALJ's Decision**

The ALJ found that Plaintiff's bilateral vocal cord paralysis and permanent tracheostomy are severe impairments, but that his depression and mental impairments are not severe. The ALJ concluded that Plaintiff does not have an impairment or combination of impairments that meets or equals those listed in the Social Security Regulations, and proceeded to find him capable of performing a significant number of file clerk (6,200 jobs) and general office clerk (4,600 jobs) positions available in the regional economy. (R. 15, 19.)

In reaching this conclusion, the ALJ stated that Plaintiff has only mild restrictions in the ability to perform activities of daily living; maintain social functioning; and maintain concentration, persistence or pace. He also found that Plaintiff had not suffered any episodes of decompensation.

(R. 15.) The ALJ acknowledged the contrary conclusion reached by Dr. Gardner, but determined that this new evidence was not compelling. First, Plaintiff "clearly worked with these [mental] problems in the past," even though he claimed to have just "stood around and collected a paycheck." (*Id.*) In addition, Dr. Gardner's "'snapshot' diagnosis" based on a "one time consultation and testing" was not consistent with the medical evidence or Plaintiff's actual functioning. (R. 17.) The ALJ stressed that Plaintiff had performed semi-skilled work in the past despite his recent IQ test scores, and that he did not receive any mental health treatment while he was incarcerated. (*Id.*)

In the ALJ's view, Plaintiff's statements concerning the intensity, persistence and limiting effects of his impairments were not wholly credible. Plaintiff testified that he sits for up to 17 hours per day and can lift 10 pounds, which is sufficient to do at least sedentary work. (R. 17-18.) As for Plaintiff's claims of forgetfulness and lack of interest, the ALJ noted that Plaintiff was diagnosed with depression in the emergency room "with no real follow up," and that even after attemping suicide in prison, Dr. Ibe found no need to administer Plaintiff any mental health treatment. (R. 18.)

## DISCUSSION

### A.  Standard of Review

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). In reviewing this decision, the court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* (citation omitted). The court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing 42 U.S.C. § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004).

Although this court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (internal citations omitted). The court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young,* 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

**B.      Five-Step Inquiry**

To recover SSI under Title XVI of the Social Security Act, a claimant must establish that he is disabled within the meaning of the Act. 42 U.S.C. § 1382c(a)(3); *Keener v. Astrue*, No. 06-CV-0928-MJR, 2008 WL 687132, at *1 (S.D. Ill. Mar. 10, 2008); *York v. Massanari*, 155 F. Supp. 2d 973, 977 (N.D. Ill. 2001). A person is disabled if he is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905. In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. § 416.920; *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

**C.	Analysis**

In support of his request for a reversal and remand, Plaintiff argues that the ALJ "played doctor" in rejecting Dr. Gardner's psychological evaluation; and erred in failing to conclude that he met Listing 12.05C for Mental Retardation.  As a result of these errors, Plaintiff contends, the ALJ made an improper RFC assessment, and asked the vocational experts flawed hypothetical questions.  Plaintiff finally argues that Ms. Peters' testimony was not consistent with the DOT.  The court addresses the arguments below.

**1.	Dr. Gardner's Report**

Plaintiff first objects that the ALJ improperly rejected Dr. Gardner's opinion without pointing to any medical evidence that contradicted her report. (Pl. Mem., at 7-8.)  It is well-established that "[a]n ALJ may not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record." *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005).  Here, the ALJ stressed that Plaintiff did not require any mental health treatment while in prison despite having attempted suicide. (R. 17, 18.)  He also characterized Dr. Gardner's evaluation as a "'snapshot diagnosis'" that was inconsistent with "the medical evidence." (R. 18.)

To be sure, on November 5, 2004, Dr. Ibe reported that Plaintiff had no complaints of depression, anxiety or recent thoughts of harming himself or others, and he found Plaintiff to have a normal mood and affect, and "a clear and stable mental status." (R. 230.)  Dr. Gardner, however, evaluated Plaintiff more recently in April 2007, and found him to be "below 99 percent of same-aged peers" in intelligence; "clearly depressed"; and markedly limited in most areas of mental functioning. (R. 338-55.)  Unlike Dr. Ibe, who only conducted an intake examination of Plaintiff, Dr. Gardner based her evaluation on a clinical interview; a diagnostic mental status exam; the Wechsler Adult Intelligence Scale-III; the Wide Range Achievement Test-4; the Beck Depression Inventory-II; and a symptom checklist. (R. 336.)  She also completed the only mental RFC of Plaintiff in the record. (R. 341-56.)  The ALJ failed to explain why he gave Dr. Ibe's one-time assessment of Plaintiff more

weight than Dr. Gardner's.  *See, e.g., Williams v. Apfel*, 48 F. Supp. 2d 819, 825 (N.D. Ill. 1999) (ALJ erred in rejecting "the only medical evidence" relating to the plaintiff's cognitive disorders).

The Commissioner finds no error here, noting the ALJ's conclusion that Plaintiff's prior history of working in semi-skilled jobs was inconsistent with Dr. Gardner's mental findings.  (R. 17; Def. Resp., at 6.)  SSR 82-41, however, recognizes that "the content of work activities in some semiskilled jobs may be little more than unskilled." 1982 WL 31389, at *2. Ms. Peters testified that the chemical tank cleaner and paper cutter/printer jobs were both unskilled, and both she and Mr. Pagella agreed that the forklift operator position was at the low end of semi-skilled.  (R. 37, 52.) According to Plaintiff, he was fired from the forklift operator job after only five or six months because he hit a trailer and lacked the necessary skills.  The ALJ failed to explain why these jobs supported a wholesale disregard of Dr. Gardner's medical evaluation.  *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) ("The ALJ . . . must build a logical bridge from evidence to conclusion."); *Williams*, 48 F. Supp. 2d at 825 (ALJ improperly played doctor when he assessed the plaintiff's disorders by analyzing his work history and daily activities).

The ALJ also appears to have afforded improper weight to the fact that Plaintiff did not pursue treatment after being diagnosed with depression on May 16, 2006.  (R. 18.)  The Commissioner correctly notes that failure to seek medical treatment may be inconsistent with a claim of debilitating impairments.  *Haynes v. Barnhart*, 416 F.3d 621, 630 (7th Cir. 2005); *Diaz v. Chater*, 55 F.3d 300, 308 n.4 (7th Cir. 1995).  This may provide a basis for finding that Plaintiff's statements regarding the severity of his impairments were less than credible.  *Id.*  It does not, however, suffice to justify rejecting Dr. Gardner's uncontradicted mental RFC assessment.  Indeed, Plaintiff consistently reported that he had taken strong antipsychotic medications from age 18 to 25; he sought treatment for depression at the Stroger Hospital ER and received a psychiatric referral in May 2006; and in June 2006, he received prescriptions for Trazodone and Prozac.  (R. 213, 230, 271-72, 337.)  *Cf. Griffith v. Callahan*, 138 F.3d 1150, 1155 (7th Cir. 1998) (affirming

ALJ's finding that the plaintiff retained the mental ability to perform unskilled work where "[n]one of her treating physicians referred her to a mental health specialist for treatment, nor did she initiate treatment on her own."); *Brihn v. Astrue*, 582 F. Supp. 2d 1088, 1097 (W.D. Wis. 2008) (ALJ reasonably found no medically determinable mental impairment where the plaintiff was never referred for a mental health evaluation).

Moreover, "the ALJ 'must not draw any inferences' about a claimant's condition from th[e] failure [to seek treatment] unless the ALJ has explored the claimant's explanations as to the lack of medical care." *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008) (quoting SSR 96-7p)). Here, Plaintiff testified that he applied for a medical card but "[t]hey denied me due to the Social Security hearing." (R. 67.) The ALJ offers no explanation as to why he found this testimony "not very truthful." (R. 18.) *See also* SSR 96-7p (an explanation for not seeking medical care may include that the claimant is "unable to afford treatment" and does not have "access to free or low-cost medical services.")

The Commissioner suggests that the ALJ nonetheless acted reasonably in discounting Dr. Gardner's findings because there was evidence in the record that Plaintiff can read at a level higher than the third grade. (Def. Resp., at 9.) The Commissioner notes that Plaintiff admitted on his disability application that he can read (R. 158); Plaintiff testified that he would read a couple pages of a book until he lost interest (R. 34); and Plaintiff's sister reported that he likes to read (R. 214). (Def. Resp., at 9.) These facts, however, are not necessarily inconsistent with a finding that Plaintiff, who at one point indicated he was placed in special education classes, cannot read above a third grade level. (R. 62, 337.) There was no testimony, for example, regarding the types of materials Plaintiff would read. The Commissioner also stresses that Plaintiff's past work as a forklift operator required writing and completing reports. (R. 193.) Yet, the ALJ never asked Plaintiff to describe the nature of those reports, and he only held the job for a few months. This matter thus was not properly developed in the record.

13

On the current record, the court cannot say that the ALJ's decision to reject Dr. Gardner's mental assessment is supported by substantial evidence. *See Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("[T]he ALJ improperly disregarded the most recent objective evidence of plaintiff's [mental] limitations submitted by Dr. Shapiro" and "improperly substituted his judgment" of the plaintiff's condition).

### 2. Remaining Arguments

The court finds that the error with respect to Dr. Gardner's report affected other aspects of the ALJ's assessment, requiring that the case be remanded for further evaluation. For example, an RFC must be "based on all the claimant's impairments and all the relevant evidence in the record." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009). *See also Villano*, 556 F.3d at 563 ("In determining an individual's RFC, the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe.") Similarly, "an ALJ's hypothetical questions to a [vocational expert] 'must include all limitations supported by medical evidence in the record.'" *Id.* at 520 (quoting *Steele*, 290 F.3d at 942). Absent proper explanation as to why the ALJ rejected Dr. Gardner's mental assessment, the court cannot determine whether the ALJ acted properly in failing to include any mental limitations in his RFC or in his hypothetical questions to Mr. Pagella and Ms. Peters. *See Craft*, 539 F.3d at 676 ("Mental limitations must be part of the RFC assessment, because "[a] limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, coworkers, and work pressures in a work setting, may reduce [a claimant's] ability to do past work and other work.'")

The court also agrees that on remand, the ALJ should ensure that he complies with SSR 00-4p and confirm that a person with all of Plaintiff's relevant limitations can perform any jobs identified. *Prochaska v. Barnhart*, 454 F.3d 731, 735 (7th Cir. 2006). Here it appears that the ALJ

failed to ask Mr. Pagella whether his testimony was consistent with the DOT as required by SSR 00-4p, but ultimately relied on jobs Mr. Pagella identified as being within Plaintiff's RFC.

At the same time, the court is not persuaded that the ALJ erred in failing to consider whether Plaintiff met Listing 12.05C for Mental Retardation. To meet the requirements of this Listing, Plaintiff must have (1) "significantly subaverage general intellectual functioning"; (2) "deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22"; (3) "[a] valid verbal, performance, or full scale IQ of 60 through 70," and (4) "a physical or mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, Subpart P, App. 1 § 12.05. *See also Novy v. Astrue*, 497 F.3d 708, 709 (7th Cir. 2007); *Fischer v. Barnhart*, 309 F. Supp. 2d 1055, 1062 (N.D. Ill. 2004).

Plaintiff addresses only the last two factors, noting Dr. Gardner's finding that (1) he has a Verbal IQ score of 68; a Performance IQ score of 72; and a Full-Scale IQ score of 67; (2) he "gave good effort, and for that reason, test results are deemed to validly reflect his current level of functioning"; and (3) he meets Listing 12.03 for Schizophrenic, Paranoid, and Other Psychotic Disorders, and is markedly limited in most areas of mental functioning. (R. 338, 341-45.) *See also Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999) (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(D)) ("In cases where more than one IQ is customarily derived from the test administered, i.e., where verbal, performance, and full-scale IQs are provided . . ., the lowest of these is used in conjunction with 12.05.") Plaintiff does not, however, offer any basis for concluding that he has significantly subaverage general intellectual functioning or deficits in adaptive functioning.

To the contrary, Dr. Gardner did not find that Plaintiff met Listing 12.05C for Mental Retardation, and she opined that he would be capable of managing his own funds if he were awarded benefits. (R. 340.) *Cf. King v. Barnhart*, No. 1:06-cv-0381-DFH-TAB, 2007 WL 968746, at *3 (S.D. Ind. Feb. 26, 2007) (finding claimant to have deficits in adaptive functioning where he

15

"would be incapable of managing his funds independently.") In addition, Plaintiff was able to hold jobs despite his low IQ, suggesting that he could "cope with the challenges of ordinary everyday life." *Novy*, 497 F.3d at 709, 710 ("[P]ersons with an IQ in the 60s (or even lower) may still be able to hold a full-time job" and "the social security disability program is not an unemployment-benefits law.") *See also Smallwood v. Astrue*, No. 2:08-cv-85, 2009 WL 2475272, at *9 (N.D. Ind. Aug. 11, 2009) ("The Circuit courts presume that a person's IQ remains stable absent evidence of a change in intellectual function.") Plaintiff has not demonstrated that the ALJ erred with respect to Listing 12.05C.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [Doc. 18] is granted in part and denied in part. Defendant's Cross Motion for Summary Judgment [Doc. 24] is denied. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Administration for further proceedings consistent with this opinion.

ENTER:

Dated: August 26, 2009

*Nan R. Nolan*

NAN R. NOLAN
United States Magistrate Judge